IN RE INTEREST OF P.M.C., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, APPELLEE, V. V.C.T., APPELLANT.

437 N.W.2d 786

Filed March 31, 1989.    No. 88-604.

Dean N. Hansen for appellant.

Ted S. Griess, Clay County Attorney, and Jay J. Sullivan, guardian ad litem, for appellee.

HASTINGS, C.J., WHITE, CAPORALE, and FAHRNBRUCH, JJ., and COADY, D.J.

WHITE, J.

V.C.T., the natural mother of P.M.C. (born May 18, 1983), the minor child involved in these proceedings, appeals from an order of the county court for Clay County, sitting as a juvenile court, terminating her parental rights. We affirm.

When P.M.C. was approximately 2 months old, she was removed from the care of her mother, and a petition was filed on July 21, 1983, in the county court for Clay County, alleging that P.M.C. was a "juvenile who is homeless or destitute, or without proper support through no fault of her parent, guardian or custodian," pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 1982). The court adjudicated P.M.C. as a juvenile under § 43-247(3)(a) and made her a ward of the court under the supervision of the Nebraska Department of Social Services (DSS). A rehabilitation plan for the appellant was also ordered, and an initial plan was eventually adopted by the court on October 4. Subsequently, a second plan was devised by the appellant and her attorney and adopted by the

court on February 14, 1984.

Allegedly because of the appellant's failure to rehabilitate under either plan, a motion for termination of parental rights was filed on August 21. Termination of appellant's rights was ordered by the county court. The district court for Clay County, on appeal, reversed and remanded the case to the county court for development of further plans and efforts at rehabilitation. On appeal to this court, we affirmed the district court's decision in *In re Interest of P.M.C.*, 221 Neb. 33, 374 N.W.2d 598 (1985).

Following remand of the case to the county court, a third plan was developed and adopted by that court on March 4, 1986. During this period, appellant married and had another child, M.T. (born April 5, 1986). At this time, no petition has been filed for termination of parental rights regarding this child. Believing that appellant had failed to comply with the latest plan, P.M.C.'s guardian ad litem filed a petition for, and the county attorney filed a motion for, an order terminating parental rights on March 8, 1988. On May 24, the county court made its findings and entered an order terminating the appellant's parental rights and those of the natural father, whose identity and whereabouts remain unknown. Only the parental rights of the mother are involved in this appeal, since there has been no appearance made by or entered on behalf of P.M.C.'s natural father.

The mother appeals, assigning four errors, which can be consolidated as follows: The county court erred in finding that there was sufficient evidence to terminate appellant's parental rights and in denying appellant's request for extended and unsupervised visits with her child.

With respect to appellant's first assignment of error, she argues that her parental rights were improperly terminated because there was not sufficient evidence to support a finding of noncompliance with a rehabilitation plan, under Neb. Rev. Stat. § 43-292(6) (Reissue 1988), or neglect, pursuant to § 43-292(2). This court has held that noncompliance with a reasonable plan of rehabilitation is sufficient grounds for termination of parental rights. *In re Interest of A.Z., B.Z., and R.Z.*, 230 Neb. 291, 430 N.W.2d 901 (1988). Because we find that there is sufficient evidence to terminate appellant's

parental rights on the basis of noncompliance with the rehabilitation plan, we limit our analysis to that issue.

Section 43-292 provides:

> The court may terminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that . . . .
>
> . . . .
>
> (6) Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination.

Under § 43-292(6), a juvenile court has the discretionary power to prescribe a reasonable plan for parental rehabilitation to correct the conditions underlying the adjudication that a child is a juvenile within the Nebraska Juvenile Code. *In re Interest of A.Z., B.Z., and R.Z., supra.* This court has held that to terminate parental rights under § 43-292(6),

> "the State must prove by clear and convincing evidence that (1) the parent has willfully failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child."

*In re Interest of A.Z., B.Z., and R.Z., supra* at 298, 430 N.W.2d at 907 (citing *In re Interest of J.S., A.C., and C.S.,* 227 Neb. 251, 417 N.W.2d 147 (1987)). Specifically, appellant argues that there was insufficient evidence to support a finding that her noncompliance with the plan was willful and that even if there was willful noncompliance on her part, it did not relate to a material provision of the plan.

In our de novo review of the record, we are required to reach a conclusion independent of the trial court; however, where the evidence is in conflict, we consider and may give weight to the trial court's observation of the witnesses and acceptance of one version of the facts rather than another. In addition, because

the Supreme Court tries factual questions on the record de novo, impermissible or improper evidence is not considered. *In re Interest of A.Z., B.Z., and R.Z., supra.* The final rehabilitation plan adopted by the county court on March 4, 1986, is set out in exhibits 3 and 4. Exhibit 4 is the more detailed version of the plan, which delineates the goals the plan is designed to accomplish and contains definitions of terms included within the plan. Exhibit 3 is a simplified version of the plan, which basically contains summaries of each provision in the plan. Both versions of the plan were signed by the appellant, and appellant testified on cross-examination that she understood the rehabilitation plan.

The first provision of the plan required appellant and her husband, S.T., to acquire a suitable living place. The plan, as set forth in exhibit 4, provides as follows:

[S.T.] and [V.C.T.] shall obtain and maintain a suitable place to live utilizing appropriate household skills and performing normal household duties.

A. To "obtain" a suitable place to live shall mean to rent, lease or purchase a home or apartment in a suitable location and of such size as to meet the minimum requirements of the total family, including children if they were returned to the home. This must be done for a minimum of 6 months.

B. To "maintain" a suitable place to live shall mean to keep the utilities, taxes, insurance and any other normal expenses paid and current; to provide decent and adequate furniture of a sufficient quality and amount to accommodate the total family; *to keep the living unit clean* and demonstrate minimum basic home making skills diet, cooking and budget.

C. The purposes of these requirements are to require the parent(s) and/or stepparent to assume the responsibility for providing and maintaining an independent dwelling unit which does not include relatives, to up-grade the atmosphere in which the family unit will live and *provide minimum healthy, safe, shelter care for the children.*

(Emphasis supplied.) The version in exhibit 3 summarizes this

provision by stating that appellant and her husband shall "[m]aintain a two bedroom house or apartment for six months." At the time of trial in May 1988, appellant had lived in a mobile home in Harvard, Nebraska, for 2 years. Based on the provision in the simplified plan, appellant argues that she has complied with the plan by maintaining a residence for over 6 months. However, as evidenced by the detailed version of the plan set out above, maintenance of a residence does not refer to geographic location alone. Appellant's argument completely ignores the fact that she was also required to keep the residence clean and to provide minimum, healthy, safe shelter for her children. The evidence clearly and convincingly establishes that she did not.

The evidence shows that during her 2-year occupancy, the appellant and her husband made several improvements to the mobile home, such as installing new carpeting, replacing the water pipes, repairing the floor, changing the linoleum, and replacing the stove and the refrigerator. Yet, despite these improvements, we find that the appellant has not complied with the housing provision in the plan because she has failed to provide a healthy, clean, and sanitary place to live for her children. When the appellant and her husband first moved into the mobile home, the carpets were covered with dog urine and smelled. Concerned about health problems for the newborn child, M.T., the DSS caseworker repeatedly urged the appellant to have the carpets cleaned. Yet, it took 5 months for the appellant to correct the problem. Subsequent to appellant's moving into the home, the residence became infested with cockroaches. At one point the infestation of cockroaches was so bad the caseworker was forced to keep her purse and coat off the floor so that she would not carry any roaches home with her. Cockroaches also infested the appellant's food, the refrigerator, and the stove. In fact, the appellant testified that she used to warm up the stove to kill the cockroaches so that she could cook in it. Before finally replacing it with another, she used this stove for 2 years, yet failed to clean it sufficiently to remove the roaches. The record indicates that the residence still is infested by cockroaches. Additionally, large numbers of flies and fleas pervade the house. In one instance, the flea infestation was so

bad that the caseworker would only meet with the appellant in her car. The pest problem was not helped by the fact that the appellant kept stray animals, such as kittens, in the home. According to the appellant, one time the flies laid eggs on the kittens, which then developed into maggots, which burrowed into the animals' skin. Appellant admitted that she kept the maggot-infested kittens in the house despite the recommendations of the DSS caseworker to remove them from the residence and the presence of M.T. In addition to these specific incidents and ongoing problems, the three caseworkers who worked with the appellant all testified that appellant failed to keep her home clean and sanitary on a consistent basis. The house would only be clean for scheduled visits and would be a mess for unscheduled visits. Finally, even the appellant, on cross-examination, admitted that her home was still not a fit place to raise children, although it was getting better. The lack of sanitary conditions is particularly alarming in view of the testimony of Dr. Thomas Tonniges, a pediatrician, who treated appellant's son, M.T., on an emergency or walk-in care basis. He stated:

> I have the feeling that there were lots of other illnesses that we didn't treat him for and in view of that I'd say that he has had a generous number of infections and accidents, particularly in view of the fact that he's the single child of the family which should limit his exposure to contagious disease.

We find that there is sufficient evidence to show clearly and convincingly that appellant has willfully not complied with the portion of the rehabilitation plan requiring her to obtain and maintain suitable housing.

Appellant, acknowledging the problems with the mobile home, contends that she did not move to a better home in order to demonstrate stability and to comply with the rehabilitation plan by maintaining a residence for more than 6 months. She further alleges that she is being penalized because she lacked the financial resources to obtain better housing. Finally, she contends in her testimony at trial that all the problems that occurred with the home were not her responsibility, but the responsibility of her landlord, and she should not be penalized

for the lack of diligence of her landlord in repairing the items. Notwithstanding her claims, we reiterate that our finding of noncompliance with the housing provision of the plan is not based on evidence relating to the structural shape the home was in but, rather, on evidence demonstrating that the home was not kept in a clean, safe, and sanitary condition. In addition, the DSS caseworkers all testified that recommendations they made to make the home sanitary and clean were within the appellant's financial means. For example, to solve the rug problem the caseworker recommended a $2 bottle of ammonia; yet, it still took 3 months after that recommendation was made for the appellant to clean the rug.

Because we find that appellant has not complied with the housing provision of the rehabilitation plan, it is not necessary to discuss the evidence relating to compliance with other provisions of the plan, except to note that appellant did comply with some of the provisions. However, it was apparent that there was evidence demonstrating that in the course of complying with the rehabilitation plan, appellant has a poor attitude and is resistant to change, and because of that there is little hope of reunification. When suggestions were repeatedly made to the appellant, she did not follow them or she would temporarily implement the suggestion only to ignore the recommendation the next day. Further, the appellant has never shown any initiative to resolve any of these problems without being instructed by DSS.

Despite appellant's contention to the contrary, we also find the housing provision of the rehabilitation plan reasonable and material. Specifically, the appellant argues that since P.M.C. was adjudicated, pursuant to § 43-247(3)(a) (Reissue 1988), as a juvenile "homeless or destitute, or without proper support through no fault of his or her parent," the provisions of the rehabilitation plan are not material, since they are not rehabilitative of the condition leading to the adjudication. As this court recently said in *In re Interest of M.R., J.R., and N.R.*, 228 Neb. 47, 52, 420 N.W.2d. 924, 927 (1988):

"Materiality of a provision in a court-ordered rehabilitative plan is determined by a cause-and-effect relationship: Does a provision in the plan tend to correct,

eliminate, or ameliorate the situation or condition on which the adjudication has been obtained under the Nebraska Juvenile Code? An affirmative answer to the preceding question provides the materiality necessary in a rehabilitative plan for a parent involved in proceedings within a juvenile court's jurisdiction. Otherwise, a court-ordered plan, ostensibly rehabilitative of the conditions leading to an adjudication under the Nebraska Juvenile Code, is nothing more than a plan for the sake of a plan, devoid of corrective and remedial measures. Similar to other areas of law, reasonableness of a rehabilitative plan for a parent depends on the circumstances in a particular case and, therefore, is examined on a case-by-case basis."

(Citing *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).) At the time P.M.C. was removed from appellant's care, appellant and the child were living at the appellant's parents' house, and the appellant's parents were raising the child. It was this situation which precipitated the action on the part of DSS and ultimately led to the adjudication. Clearly, the housing provision in the plan was reasonable and material because it required the mother to take the responsibility of establishing her own home and to provide a clean, safe, and sanitary place to raise her children. Accordingly, we find that there is clear and convincing evidence to show willful noncompliance with a reasonable provision material to the rehabilitation plan.

We also find clear and convincing evidence that the termination of parental rights of the appellant is in the best interests of P.M.C. "[W]here parents are unable or unwilling to rehabilitate themselves within a reasonable time, the best interests of the children require that parental rights be terminated without delay." *In re Interest of M.R., J.R., and N.R., supra* at 53, 420 N.W.2d at 927-28. " ' "[A] child cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity." ' " *In re Interest of L.O. and B.O.*, 229 Neb. 889, 896, 429 N.W.2d 388, 393 (1988) (citing *In re Interest of Z.R.*, 226 Neb. 770, 415 N.W.2d 128 (1987)). This court has said it will not gamble with a child's

future. *In re Interest of E.R., J.R., and A.R.*, 230 Neb. 646, 432 N.W.2d 834 (1988). Every expert working during the 5-year period this case was pending, including two psychologists and several DSS caseworkers who worked with the appellant, came to the same basic conclusion: No substantial progress has been made by the appellant toward rehabilitation, and there is no likelihood of rehabilitation within the next few years. As the county court noted in its order of termination, P.M.C. has been under the care of DSS "since approximately 3 weeks after her birth on May 18, 1983, or 98 % of her life to date." P.M.C. cannot wait forever for her mother to rehabilitate herself, and she needs some permanency in her life. Therefore, we find there is clear and convincing evidence that it is in the best interests of this child to terminate appellant's parental rights.

As an aside, however, this court is disturbed by the fact that despite the shocking lack of sanitary conditions in the appellant's home, which rendered the dwelling unsuitable as a place to raise children and provided the partial basis for termination of appellant's parental rights, DSS failed to take any action with regard to the younger child, M.T. Christine McCauley of DSS, who was in charge of supervising P.M.C.'s case, testified that to remove M.T. would have caused more problems than it solved. This glaring inconsistency is particularly disturbing, since the practical effect was to ignore the best interests of the younger child by leaving him exposed to extremely unsanitary conditions. How DSS can claim that a home is unsanitary, thereby not meeting the department's minimum standard for one child to live in, and yet virtually sit idly by, leaving another child to live in these conditions, is beyond imagination and is reprehensible.

Appellant's second and last assignment of error, relating to the court's denial of appellant's requests for extended and unsupervised visits, is not addressed because the appellant fails to discuss the issue in her brief. Assignments of error not discussed are not considered by this court. *Bock v. Bank of Bellevue*, 230 Neb. 908, 434 N.W.2d 310 (1989).

Accordingly, the judgment of the county court terminating the appellant's parental rights is affirmed.

AFFIRMED.