IN RE INTEREST OF N.L.B., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. M.B., APPELLANT.
450 N.W.2d 676

Filed January 26, 1990.    No. 89-305.

Mark J. Slowiaczek for appellant.

Ronald L. Staskiewicz, Douglas County Attorney, and Elizabeth G. Crnkovich for appellee.

Michael L. Getty, guardian ad litem.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

The mother has appealed from an order of the separate juvenile court which terminated her parental rights to her 6-year-old daughter N.L.B. She assigns as error the finding that clear and convincing evidence was presented that she failed to substantially comply with the juvenile court's order of rehabilitation and that the best interests of the minor child would be served by termination of parental rights. We affirm.

Before addressing the merits of this appeal, it is necessary that we dispose of a procedural problem raised by appellee's motion to dismiss. This motion alleges that we have no jurisdiction because appellant failed to file an order of authorization by the trial court to proceed in forma pauperis within the 30-day requirement of Neb. Rev. Stat. § 25-1912 (Reissue 1989).

Section 25-1912 requires that the notice of appeal must be filed and the docket fee paid within 30 days of the rendition of the judgment or decree or the making of the final order from which an appeal is taken. The appeal is deemed perfected upon compliance with those requirements. Conversely, the Supreme Court has no power to exercise appellate jurisdiction in proceedings to review a judgment of the trial court in a civil case unless the appellant shall have filed a notice of appeal and deposited a docket fee in the office of the clerk of the district court within the time fixed by statute. *American Legion Post No. 90 v. Nebraska Liquor Control Commission*, 199 Neb. 429, 259 N.W.2d 36 (1977).

However, Neb. Rev. Stat. § 25-2301 (Reissue 1989) directs that any court of the State of Nebraska shall authorize the commencement of an appeal without prepayment of fees and costs "by a person who makes an affidavit that he or she is unable to pay such costs or give security." It is quite apparent that the Legislature intended that the filing of an affidavit of poverty was to replace the requirement of the payment of the docket fee.

In this case, appellant has filed both the notice of appeal and the poverty affidavit within the time prescribed by statute. However, the appellee points out that no order of the trial court authorizing appellant to proceed in forma pauperis was obtained within the time limitation. Reliance is made upon the following from *In re Interest of K.D.B.*, 233 Neb. 371, 372, 445 N.W.2d 620, 622 (1989): "In addition [to filing the affidavit], the party appealing must obtain the authorization of the trial court to proceed in forma pauperis. An appeal may not be taken in forma pauperis if the trial court certifies in writing that the appeal is not taken in good faith."

The second sentence of the quoted portion from *K.D.B.* is taken from § 25-2301. However, although it may be customary and a mark of prudence for an appellant to obtain authorization of the trial court in order to forestall any finding of a lack of good faith and possible dismissal of the appeal, contrary to appellee's assertion, there is no statutory requirement that such authorization be obtained in order to make the affidavit effective. *K.D.B* is not controlling here because in that case the appeal was not perfected because the purported affidavit was defective.

In any event, we hold that all that is necessary for one proceeding in forma pauperis to confer jurisdiction on this court on appeal is to file the notice of appeal and the affidavit of poverty required by § 25-2301. The motion to dismiss is overruled.

Turning to the merits of the appeal, this is another case involving one of several children of an unwed mother who by reasons of health or mental capacity and complete lack of interest is wholly unable and unwilling to cope with the situation. This child was one of seven born to the mother as the result of temporary relationships with three or four different men. Beginning in October 1984, the child involved here was placed in voluntary foster care because the mother was overwhelmed with the care of her then three children, particularly with the care of another daughter who was hospitalized because of leukemia.

Pursuant to a petition filed on July 26, 1985, the juvenile court issued an order for immediate custody and placement of

the child in foster care. The petition in substance alleged that because of the mother's nomadic lifestyle and overuse of babysitters the child had been deprived of a stable home; the mother had failed to provide the child timely and necessary medical care; the child's personal hygiene had been neglected; and the mother had refused to cooperate with several agencies made available to assist her with parenting skills.

An adjudication hearing was held on March 11, 1986, following which the court determined in essence that the petition was true. Upon a review hearing held on April 18, 1986, the court ordered that the child remain in the custody of the Department of Social Services and ordered the mother to comply with the following plan for rehabilitation:

    a. Maintain a stable and clean residence;

    b. Cooperate with all the workers including FITS [Family Intervention and Treatment Service] personnel;

    c. Notify the Court of any change in residence immediately;

    d. Maintain a steady legal income;

    e. Keep all rent payments current;

    f. Have visitation as arranged by the guardian ad-litem, probation officer and Nebraska Department of Social Services; to include extended visits, progressing to overnights at the discretion of the FITS Staff and other workers involved;

    g. Continue to allow the Visiting Nurse in her home.

On June 18, 1986, the juvenile court modified the previous order to the extent that the child was allowed to be placed in the care and in the home of the mother.

In January 1987, the juvenile court created additional requirements on the mother by requiring that she participate in a job training program and in family therapy or parent education and that the child be enrolled in a preschool program.

At a review hearing held on April 16, 1987, it was discovered that there was inadequate supervision of the child and that there was a problem of alcohol abuse on the part of the mother's current live-in boyfriend. The court found that the best interests of the child required her to be placed in the temporary

custody of the Department of Social Services.

Further review hearings were had on September 23, 1987, and March 22, 1988, at which times it was discovered that the mother continued to be in noncompliance with the plan for rehabilitation.

A motion to terminate parental rights was filed on August 24, 1988, and a series of hearings was held beginning on December 15, 1988, and concluding on January 24, 1989. The juvenile court then sustained the motion on the basis that clear and convincing evidence had shown that the child was within the meaning of Neb. Rev. Stat. § 43-292(6) (Reissue 1988) because reasonable efforts, under the direction of the court, had failed to correct the conditions leading to the previous determination that the child was within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988) and that in the best interests of the child, the parental rights of the mother over her should be terminated.

In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, which requires the Supreme Court to reach a conclusion independent of the findings of the trial court, but, where evidence is in conflict, the Supreme Court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. *In re Interest of R. T. and R. T.*, 233 Neb. 483, 446 N.W.2d 12 (1989); *In re Interest of P.M.C.*, 231 Neb. 701, 437 N.W.2d 786 (1989); *In re Interest of P.D.*, 231 Neb. 608, 437 N.W.2d 156 (1989).

We have held that to terminate parental rights under § 43-292(6), the State must prove by clear and convincing evidence that (1) the parent has willfully failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan, and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child. *In re Interest of S. C., S. J., and B. C.*, 232 Neb. 80, 439 N.W.2d 500 (1989); *In re Interest of P.M.C., supra; In re Interest of R. T. and R. T., supra.*

A parent's failure to make reasonable efforts to comply with a court-ordered plan of rehabilitation designed to reunite the

parent with the child presents an independent reason justifying termination of parental rights. *In re Interest of J.H. et al.*, 233 Neb. 338, 445 N.W.2d 599 (1989).

Where a parent is unable or unwilling to rehabilitate herself within a reasonable time, the best interests of the children require termination of parental rights. *Id.*

The child in this case is a child with certain disabilities requiring special care. Due to problems with speech delay and hearing, the child, while in foster care, has been placed in a special education program. She requires a higher than average home situation in order to help her function in society.

Regarding the failure to provide clean housing, as early as December 1982, an older brother of the child had been removed from the mother's home partially because the house was poorly kept.

The problem with maintaining a clean house is a problem the juvenile court had been addressing for at least 6 years prior to the date of the termination hearing. No consistent or long-lasting progress has been made in this respect in spite of the fact that homemaker service on four different occasions assigned homemakers to work with the mother. She showed, for the most part, complete indifference to this proffered help.

The mother was required to participate in a job training program and obtain employment. She failed to fully comply with these requirements as well. The mother's employment history is equally unimpressive. She worked a total of perhaps 3 or 4 months from March 1987 to May 1988.

Although she was ordered to attend counseling sessions and cooperate with personnel involved, the mother's compliance was sporadic at best. She utterly failed to follow through with required additional counseling and individual therapy. Personnel from Family Intervention and Treatment Service who were to counsel with the mother would frequently find no one at home. The child's foster parents testified that the mother told them that she and her boyfriend would frequently hide in a closet and pretend they were not home when the people from FITS would call.

The mother's excuses for her failure to comply with the court-ordered plan included her pregnancies and a lack of

transportation, although she conceded that she knew transportation could be arranged for her.

It is apparent that the mother has not complied with the court's plan of rehabilitation. In light of the protracted nature of the juvenile court's involvement, dating back nearly 6 years for some deficiencies, the mother's ability to rehabilitate herself seems remote, if not hopeless. The primary consideration in considering whether parental rights should be terminated is a child's best interests. *In re Interest of J.H. et al., supra*. A child cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity. *Id*. The mother has been either unable or unwilling to rehabilitate herself within a reasonable period of time. Thus, the best interests of the child require that the parental rights be terminated.

The mother, in her brief, advances argument that the requirements set forth in the court orders are unreasonable and onerous. Exactly which requirements are unreasonable and onerous are not specified. Neither is there an explanation provided as to why any of the requirements are unreasonable and onerous. The argument is also not within the scope of the assigned errors.

This court will only consider errors that are assigned and discussed, although it may note plain error which is not assigned. Neb. Rev. Stat. § 25-1919 (Reissue 1989); Neb. Ct. R. of Prac. 9D(1)d (rev. 1989). It is not the duty of a reviewing court to search the record for the purpose of ascertaining whether there is error, and any error must be specifically pointed out. *Coyle v. Janssen*, 212 Neb. 785, 326 N.W.2d 44 (1982).

Even if the argument is considered, this court can find no merit in it. A juvenile court has the discretionary power to prescribe a reasonable plan for parental rehabilitation to correct the conditions underlying the adjudication that a child is a juvenile within the Nebraska Juvenile Code. *In re Interest of J.H. et al., supra*.

The judgment of the juvenile court is affirmed.

AFFIRMED.

CAPORALE, J., dissenting.

Although I agree with the outcome the majority reaches, I

must dissent on procedural grounds.

In deference to the fact that no question as to the validity of the poverty affidavit was raised and briefed by the parties, the majority does not comment on the State's representation in its motion for dismissal that the poverty affidavit was "signed by" the appellant. In actuality, the affidavit was executed not by the appellant, but by her attorney.

As the majority notes, Neb. Rev. Stat. § 25-2301 (Reissue 1989) requires that the impoverished appellant, not her or his attorney, execute the affidavit which substitutes for the payment of fees and costs and the posting of security. Approximately a century and a third ago, Georgia established the principle that statutes such as § 25-2301 are to be strictly construed, and, thus, an affidavit of poverty executed by a party's attorney does not suffice. *Elder vs. Whitehead et al.*, 25 Ga. 262 (1858). Accord, *Jackson v. Fincher*, 128 Ga. App. 148, 195 S.E.2d 762 (1973); *Cohen v. Hautcharow*, 84 N.Y.S. 573 (1903). As stated in *Vance v. Vance*, 197 Miss. 332, 335, 20 So. 2d 825, 826 (1945), "[I]f a statute specifically prescribes who shall make a certain affidavit, it can be made by none other than the person specified, although there is nothing in the language of the statute to show that its designation was intended to be exclusive."

The circumstances of this case demonstrate that there are sound reasons beyond the words of § 25-2301 for requiring that an appellant personally execute an affidavit which asserts poverty. The attorney's affidavit recites that the appellant was not gainfully employed during the period he represented her, that she was now living in Gettysburg, Pennsylvania, and that attempts to contact her concerning the affidavit were unsuccessful. On those meager and meaningless facts the attorney nonetheless ventured to swear that the appellant "is without sufficient funds to pay for the cost of this appeal."

I can understand an attorney's desire to do all that can legally be done to protect a client's interests and to thereby protect himself or herself from a subsequent claim that he or she was derelict in his or her duty, but how could the attorney in this case know his client's financial position at the time he executed the affidavit? The answer is that he cannot. He knew only what she

told him her condition was when she was living in his area. By reciting that he could not reach his client to discuss the poverty affidavit with her, the attorney admitted that he did not know what her condition was at the time he took an oath on the matter. He had no basis for representing that she was then a pauper, and his representation therefore is not worthy of credence. The mere fact that the appellant left the local area suggests that something changed in her life. That change may well have had an effect on her financial position. Beyond that, we have no way of knowing that she wanted to appeal; she may well have accepted the result below as inevitable and elected to move on with her life.

Nor is it too much to ask one whose legal bills are being paid by the taxpayers to keep in touch with her or his attorney and to remain available to do whatever is necessary in furtherance of the litigation, if furthering the litigation is the client's desire. It is only fitting and proper that, in addition to whatever civil or other criminal sanctions may result, an appellant proven to have falsely sworn to poverty be subject to the penalties for perjury.

Moreover, I am not at all certain that an attorney who executes an affidavit concerning a client's financial condition does not violate the advocate-witness rule. See, *State ex rel. NSBA v. Neumeister, ante* p. 47, 449 N.W.2d 17 (1989); *Porter v. Porter*, 274 N.W.2d 235 (N.D. 1979).

For the foregoing reasons, I would dismiss the appeal for want of jurisdiction.

SHANAHAN and FAHRNBRUCH, JJ., join in this dissent.